**JUDGE REARDEN**

# 23 CV 01244

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

ROOSEVELT PARENT LLC,
ROOSEVELT MANAGEMENT
COMPANY LLC, RUSHMORE LOAN
MANAGEMENT SERVICES LLC, and
DAKOTA ASSET SERVICES LLC,

        Plaintiffs,

        -against-

SELECT PORTFOLIO SERVICING, INC.,

        Defendant.

Civil Action No.

**REDACTED COMPLAINT**

      Plaintiffs Roosevelt Parent LLC ("Roosevelt Parent"), Roosevelt Management Company LLC ("Roosevelt"), Rushmore Loan Management Services LLC ("Rushmore"), and Dakota Asset Services LLC ("Dakota"), by and through their counsel Quinn Emanuel Urquhart & Sullivan, LLP, bring this Complaint against Defendant Select Portfolio Servicing, Inc. ("Purchaser" or "Defendant"), alleging as follows:

### NATURE OF THE ACTION

      1.    Plaintiffs are would-be sellers of a mortgage loan servicing business to Defendant Select Portfolio Servicing, Inc., a subsidiary of Credit Suisse Group AG ("Credit Suisse"). Defendant breached its agreement to purchase Plaintiffs' assets, claiming at the eleventh hour that the maelstrom of regulatory issues surrounding its parent corporation prevented Defendant from moving forward with the acquisition. But the parties' agreement did not permit Defendant to evade its obligations on the basis of Credit Suisse's well-publicized difficulties. Plaintiffs bring this Action to seek damages, including payment of the Termination Fee, for Defendant's

breaches of the parties' agreement, its intentional misrepresentations, and its failure to disclose material information.

2.      On September 13, 2022, Plaintiffs, non-party Potomac Technology Ventures LLC ("Potomac Ventures"), and Purchaser executed the Asset Purchase Agreement ("APA"), [1] pursuant to which Purchaser agreed to buy from Sellers[2] certain mortgage servicing, information technology, and real estate management assets.

3.      Following the signing of the APA, the parties proceeded with preparations for Closing, with counsel to each party exchanging a volley of information required by the APA. As preparations for Closing proceeded, the parties mutually agreed on a Closing Date of November 30, 2022 and worked diligently toward Closing on that date.

4.      Then, suddenly—just days before the transaction was set to close—Purchaser abruptly reneged on the agreed-upon Closing Date, claiming that Closing would not be "feasible" due to an unspecified "regulatory matter" involving Credit Suisse. Purchaser offered no explanation as to why a regulatory matter involving Credit Suisse would affect *Purchaser's* obligation to consummate the Closing. This was particularly confusing to Plaintiffs given Purchaser's repeated representations in the APA that no material governmental or regulatory approvals (except those explicitly disclosed and agreed upon by the parties) were required.

5.      After nearly a month of Plaintiffs' attempts to get an explanation or a new reasonable target Closing Date from Purchaser, Purchaser revealed a critical piece of information: ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

---

[1]   The APA is attached hereto as Exhibit A. Capitalized terms used but not defined herein have the meanings set forth in the APA, as subsequently amended.

[2]   "Sellers" refers to Plaintiffs Rushmore, Dakota, and non-party Potomac Ventures.

6.      Prior to this revelation, Purchaser had not disclosed its position ████████ ██████████████████████████████████ to consummate the transaction.   In fact, Purchaser had made explicit representations and warranties to the contrary in the APA.   These representations and warranties fraudulently induced Plaintiffs to enter into the APA, and, having relied on Purchaser's misrepresentations and omissions, Plaintiffs were stuck for months as Purchaser allegedly sought this undisclosed approval.

7.      Although Plaintiffs understand that Purchaser may have been restricted as to what it could disclose to Plaintiffs ████████████████████████ Purchaser ████████ ██████████████████████ to make the relevant and necessary disclosures to Plaintiffs prior to inducing Plaintiffs to enter into the APA.   In any event, any confidentiality obligations that Purchaser may have been facing did not give it license to deceive.   There is no excuse for Purchaser's misrepresentations to Plaintiffs in its representations and warranties, or for Purchaser's failure to perform its obligations under the APA.

8.      In the weeks after Purchaser's disclosure of ████████████████, Plaintiffs were left in an impossible limbo.   Purchaser did not consummate the Closing and refused to take a position one way or the other on whether it would *ever* be able to consummate the Closing.   During that period, Plaintiffs remained bound by the APA's "no shop" provision— and unlike Purchaser, Plaintiffs honored the APA's requirements.   As such, Plaintiffs could not consider or solicit competing offers  for these valuable assets notwithstanding an active market and a number of other potentially interested buyers.

9.      Purchaser repeatedly asked Plaintiffs for more time and patience.   Fulfilling their duty of good faith to Purchaser, Plaintiffs obliged at great expense, causing Plaintiffs significant harm.

10.    Not only was sale of the relevant assets important to Plaintiffs' businesses, ▮▮▮

████████████████████████████████████████    ███████████████

██████████████████████████████████████████████████████████

████████████████████████████

11.    Finally, after months of stringing Plaintiffs along, Purchaser informed Sellers on January 27, 2023—without any detail, explanation, or supporting documentation—that ▮▮▮ ████████████████████████████████████████████████████████ In the same communication, Purchaser purported to terminate the APA under Section 9.01(g) of the APA.

12.    As further explained below, Sellers sent Purchaser a letter on January 31, 2023 explaining that Purchaser's purported termination was invalid.  The current situation, brought about by Purchaser's misconduct, is not the situation contemplated by Section 9.01(g).  Nor can Purchaser invoke that section here, where the Purchaser and its parent contributed to the conditions purporting to prevent the Purchaser's performance.

13.    In that same letter, Sellers terminated the APA pursuant to Sections 9.01(c) and 9.01(e) based on Purchaser's breaches and flagrantly false representations and warranties.  As the APA makes clear in Section 9.03(c), this entitled Plaintiffs to a Termination Fee, due and payable on February 3, 2023.  Purchaser has not paid that fee.

14.    Accordingly, Plaintiffs bring this action for breach of contract, fraud, and declaratory relief, seeking: a declaration that Plaintiffs have validly terminated the APA and are entitled to the Termination Fee provided for in the APA,[3] an award of the Termination Fee, and monetary damages for breach of the APA and Purchaser's fraud.

---

[3]    Although not a party to this litigation, Potomac Ventures has consented to Plaintiffs bringing these claims.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship, and the amount in controversy exceeds $75,000.

16.     Purchaser has consented to personal jurisdiction and venue in this Court under Sections 11.07 and 11.08 of the APA, in which the parties agreed and submitted to the jurisdiction of the federal court in the Borough of Manhattan in any action or proceeding in connection with the APA.

17.     Furthermore, the Court has personal jurisdiction over Purchaser under CPLR §§ 301 and 302(a) because Purchaser regularly does and solicits business within the State of New York, and/or expected or reasonably should have expected that its acts would have consequences within the State of New York.

18.     Venue in this Court also is proper under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

## THE PARTIES

19.     Purchaser is a Utah corporation with its principal place of business in West Valley City, Utah.

20.     Dakota is a Delaware limited liability company with its principal place of business in Irving, Texas.  Dakota's sole member is Rushmore, a Delaware limited liability company with its principal place of business in Irving, Texas.

21.     Rushmore is a Delaware limited liability company with its principal place of business in Irving, Texas.  Rushmore's sole member is Roosevelt, a Delaware limited liability company with its principal place of business in New York, New York.

22.     Roosevelt is a Delaware limited liability company with its principal place of business in New York, New York.  Roosevelt's sole member is Roosevelt Parent, a Delaware limited liability company with its principal place of business in New York, New York.

23.     Roosevelt Parent is a Delaware limited liability company with its principal place of business in New York, New York.  Roosevelt Parent's members are citizens of California, Delaware, New Jersey, New York, and Texas.

## FACTUAL BACKGROUND

### The Parties Negotiate And Execute The APA

24.     Sellers are engaged in the following businesses, among other things: (a) the mortgage servicing and subservicing business operated by Rushmore; (b) the information technology business operated by Potomac Ventures; and (c) the real estate management business operated by Dakota.

25.     Purchaser is a sophisticated party that expressed a strong interest in buying certain assets from Sellers, and after agreeing that such a transaction would be mutually beneficial, the parties engaged in extensive negotiations over several months regarding the terms of the transaction.  All parties engaged legal counsel, and the draft APA was thoroughly evaluated by counsel for both sides and went through several rounds of edits from Plaintiffs and from Purchaser before it was finalized.

26.     Purchaser's parent company, Credit Suisse, was also involved in the transaction negotiations.  From the outset, Credit Suisse took an active role in the parties' negotiations and

participated in calls regarding the deal.  Notably, however, Credit Suisse is not a party to the APA.

27.     At Purchaser's request, the deal was structured as an asset deal rather than an equity deal.  Purchaser indicated such a structure would be beneficial for its execution of the transaction.

28.     The final APA was executed as of September 13, 2022 among Sellers, Purchaser, Roosevelt and Roosevelt Parent, memorializing the terms of the transaction (the "Transaction"). The provisions most relevant to this dispute are described below.

29.     Purchaser made certain representations and warranties to Plaintiffs at the time of the APA's execution.  Critically, Purchaser represented:

> ***The execution, delivery and performance by Purchaser of this Agreement*** and the Transaction Agreements and the consummation by Purchaser of the transactions contemplated hereby and thereby ***does not and will not require any consent, approval, authorization or permit of***, action or waiver by, filing with or delivery of notice to, ***any Governmental Authority***, except for (a) the approvals set forth in set forth in Schedule 4.04 by the applicable Governmental Authorities and (b) those consents, approvals, authorizations or permits of, actions by, filings with or notifications to, the failure of which to be made or obtained would not, individually or in the aggregate, prevent or materially delay the consummation of the transactions contemplated by this Agreement or any of the Transaction Agreements.

APA § 4.04 (emphasis added).

30.     Section 4.04 goes on to state:

> Purchaser acknowledges that Sellers and Parent will review Schedule 4.04 promptly following the date hereof and the Parties shall work cooperatively and in a commercially reasonable manner to resolve any comments or discrepancies related thereto as soon as reasonably practicable; provided that ***in the event that the Parties are unable to agree upon a final version of Schedule 4.04 on or prior to October 1, 2022*** notwithstanding such efforts, ***Section 4.04 shall be deemed to be a Fundamental Representations*** for all purposes under this Agreement.

APA § 4.04 (emphasis added).

31.     Section 4.04 was later amended to state that if agreement on a final version of Schedule 4.04 was not agreed upon by November 1, 2022, Section 4.04 shall be deemed to be a Fundamental Representation.   Ex. B (APA Amendment No. 1).   Despite the parties' commercially reasonable efforts, no final version of Schedule 4.04 was agreed upon by November 1, 2022.   Thus, ***Section 4.04 is a Fundamental Representation.***   The last draft of Schedule 4.04 exchanged in late November 2022 laid out approvals or consents required from Fannie Mae, Freddie Mac, and Ginnie Mae as well as various state branch level approvals. ***Notably,*** ███████████████████████████ ***was not listed in any draft of Schedule 4.04, on any other schedule, or anywhere else in the APA.***

32.     Even assuming Purchaser believed it ████████████████████████ ███████████████████████████████, Purchaser's representations in Section 4.04 were false.

33.     Similarly, the parties covenanted in Section 5.04(d) of the APA that they would:

> (i) permit the other party to review in advance any proposed material communication by Purchaser or Seller to any Governmental Authority . . . (ii) promptly notify a responsible officer or counsel of the other of any material communication (whether written or oral) it or any of its Affiliates receives from any Governmental Authority . . . [and] (iii) provide to the other copies of all material correspondence, filings or communications between it (or its advisors) and any such Governmental Authority . . . relating to this Agreement . . . .

APA § 5.04(d).   They also promised they would not "participate in any meeting with any Governmental Authority" regarding the transaction without "consult[ing] with the other party in advance and, to the extent permitted by such Governmental Authority. . . giv[ing] the other party the opportunity to attend and participate at such meeting." *Id.*

34.     The parties further agreed that they would "promptly notify the other Party of any written notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement." APA § 5.09.

35.     Purchaser also represented that there were no regulatory impediments to its execution of the Transaction. Specifically, Purchaser represented in the APA:

> There is no fact, event or circumstance relating to Purchaser's business, operations, financial condition, ownership or legal status that, to the Purchaser's Knowledge, would reasonably be expected to impair in any material respect the ability of the Parties hereto to obtain all consents, orders, authorizations, and approvals from any Investor or Governmental Authority necessary for the consummation of the transactions contemplated by this Agreement within the time period contemplated by this Agreement.

APA § 4.09.

36.     Similarly, Purchaser also represented:

> The execution, delivery and performance of this Agreement and the Transaction Agreements by Purchaser . . . do not and will not materially conflict with or materially violate . . . any Law or Governmental Order applicable to Purchaser or by which any of Purchaser's properties or assets is bound.

APA § 4.03.

37.     Purchaser also represented that it had "the requisite corporate power and authority" to consummate the transaction and that "[t]he execution, delivery and performance by Purchaser of this Agreement and the Transaction Agreements and the consummation by Purchaser of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary action on the part of Purchaser." APA § 4.02. This representation was a Fundamental Representation of Purchaser. *See id.* § 1.01.

38.     The APA also contains various provisions governing the Closing and the conditions precedent to the Closing.  Section 2.03(a) provides that the Closing will occur:

> [A]t 11:59 pm eastern time by e-mail transmission on the date on which the conditions set forth in Article VIII are satisfied or waived (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other date or place as Purchaser and Sellers may agree in writing . . . .

APA § 2.03(a).

39.     The APA originally contemplated that the target Closing Date would be October 31, 2022.  *Id.*  Prior to such date, however, the parties mutually agreed that the Closing Date would instead be November 30, 2022.

40.     The parties further agreed that, until Closing or Termination, Sellers would not take *any* steps toward selling the assets to  other potential purchasers:

> Sellers shall not authorize or permit its Representatives to, directly or indirectly (i) solicit, encourage, accept, entertain, facilitate, permit or initiate the submission of any inquiry, offer, proposal or indication of interest by a third-party which relates to a transaction or series of transactions involving the purchase or acquisition of the Purchased Assets (an "Acquisition Proposal"), (ii) enter into any discussions or agreement requiring Sellers to abandon or terminate the transactions contemplated hereby, (iii) participate in any discussions or negotiations regarding, or furnish any nonpublic information relating to the Purchased Assets to any third-party (other than Purchaser), or (iv) enter into any letter of intent, agreement or similar document relating to any Acquisition Proposal.

APA § 5.06.

41.     Section 2.03(b) lays out the deliveries Purchaser is obligated to make at the Closing, and Section 2.03(c) lays out the same for Sellers.  These deliverables include documents such as the Bill of Sale, Closing Certificates, and various ancillary agreements necessary to consummate the Transaction.

42.   Closing of the APA is also conditioned upon, among other things, the provision of Required Approvals by applicable Governmental Authorities.   Specifically, Section 3.04 references Schedule 3.04, which lists the Governmental Authorities from whom Sellers understood approvals are necessary for the Closing.   Schedule 3.04 in turn provides that Required Approvals are necessary from Fannie Mae, Freddie Mac, and Ginnie Mae.   These Required Approvals are also listed as conditions necessary for each party to be obligated to consummate the Closing pursuant to Sections 8.02(f) and 8.03(e).

43.   Relating to the Required Approvals described above, Sellers and Purchaser agreed they would:

> each use their commercially reasonable efforts, and shall cooperate with one another to ***obtain as promptly as practicable all Required Approvals***, Third-Party Consent, Private Servicing Agreement Consents and any other Consent necessary or desirable to assign the Assigned Contracts.

APA § 5.04(b) (emphasis added).

44.   Purchaser also covenanted to perform certain acts between signing and Closing relevant to finalizing the ancillary documents necessary to complete the Transaction. Specifically, Purchaser agreed in the APA that it would use its:

> ***commercially reasonable efforts*** to take, or cause to be taken, all actions and to do, or cause to be done, and assist and cooperate with the other Party in doing all things necessary or desirable under Applicable Law ***to consummate, in the most expeditious manner practicable, the transactions contemplated by this Agreement*** and the Transaction Agreements.

APA § 5.04(a) (emphasis added).

45.   Sections 8.02 and 8.03 establish the conditions of each party's obligation to consummate the Closing.

46.    Section 8.04 expressly provides that the failure of any pre-Closing condition to be met will not justify a party's avoidance of Closing if that failure was caused by such party:

> Neither Purchaser, Sellers nor Parent may rely on the failure of any condition set forth in Sections 8.01, 8.02 or 8.03, as the case may be, to be satisfied *if such failure was caused by such Party's failure to comply with its obligations to consummate the transactions contemplated by this Agreement* and the Transaction Agreements, as required by the provisions of this Agreement, including Section 5.01.

APA § 8.04 (emphasis added).

47.    The parties mutually agreed that "[t]ime is of the essence" to consummate the Closing.   APA § 11.16.   This is true for several reasons.   First, Plaintiffs wished—and still wish—to divest the assets at the heart of the Transaction.   ████████████████

███████████████████████████████

████████████████████  ███████████████

███████████████████████████████

████████████

48.    Purchaser has, at all relevant times, been aware of Plaintiffs' need to promptly consummate the Closing.   Accordingly, although the Termination Date of the APA is April 30, 2023, the parties always intended to consummate the Closing much sooner, first on October 31, 2022 and most recently on November 30, 2022.

49.    The APA also lays out the specific circumstances under which a party may terminate the APA.

50.    Section 9.01(c) provides that the APA may be terminated:

> by written notice from Sellers *if Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would result in the failure of any condition of Sellers' obligation to consummate the*

*transactions contemplated hereby* and (ii) either (A) has not been cured on the earlier of (x) within thirty (30) days following the delivery of written notice of such breach or failure by Sellers and (y) the Termination Date, or (B) is not capable of being cured by the Termination Date; provided that Sellers may not then be in material breach of this Agreement so as to cause the breach or failure of any condition of the Purchaser's obligation to consummate the transactions contemplated hereby . . . .

APA § 9.01(c) (emphasis added).

51.     Sellers' obligation to consummate the Transaction is conditioned on, among other things, Purchaser's Fundamental Representations in Article IV being "true and correct in all material respects, at and as of the date of this Agreement and as of the Closing Date as if they had been made again at and as of the Closing Date." *See* APA § 8.03(b).

52.     Sellers' obligation is also conditioned on the absence of any "Law or Governmental Order directly or indirectly restraining or prohibiting the transactions contemplated in this Agreement or any of the Transaction Agreements." APA § 8.01(b).

53.     Further, Section 9.01(e) provides that the APA may be terminated:

by Sellers if (i) all of the conditions set forth in Section 8.01 and Section 8.02 have been and continue to be satisfied or shall be capable of being satisfied at the Closing Date were the Closing to occur at such time and (ii) Purchaser fails to consummate this Agreement and the Transaction Agreements within two (2) Business Days of the date that the Closing should otherwise have occurred pursuant to Section 2.03(a) hereof and (iii) Sellers stood ready and willing to consummate the Closing on the date the Closing should otherwise have occurred pursuant to Section 2.03(a);

APA §9.01(e).

54.     And finally, Section 9.01(g) provides that the APA may be terminated by either Party:

if any Governmental Authority shall have issued a Governmental Order or taken any other action permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this

> Agreement, and such Governmental Order or other action ***shall have become final and nonappealable***; provided, however, that ***the right to terminate this Agreement under this Section 9.01(g) shall not be available to any Party whose failure to comply with Section 8.04 has caused, resulted in or contributed to, such action or inaction***.

APA § 9.01(g) (emphasis added).  Purchaser has not demonstrated that any such order exists.

**<u>Purchaser Suddenly Claims Closing Is Not Feasible</u>**

55.     For more than two months following the parties' execution of the APA, the parties diligently worked through the requirements for Closing.  At no point during those two months did Purchaser suggest that there would be any regulatory issues with consummating the Closing.  Nor did Purchaser disclose that it was waiting on any regulatory or governmental approvals aside from those specifically disclosed in the APA and its schedules.  Because Purchaser had represented in the APA that no other material approvals were required (*see* APA §§ 4.04, 4.03 and 4.09), Plaintiffs had no reason to believe that the Transaction would not close in the intended timeframe.

56.     As described above, the Closing of the APA is conditioned upon, *inter alia*, the provision of Required Approvals by applicable Governmental Authorities (Fannie Mae, Freddie Mac, and Ginnie Mae).  Those Governmental Authorities were aware that the parties had mutually agreed on a Closing Date of November 30, 2022.  Freddie Mac provided its Required Approval on October 26, 2022, and the Parties had no reason to believe that the applicable Required Approvals would not be provided by Fannie Mae and Ginnie Mae in advance of the intended Closing on November 30, 2022.

57.     That all changed mere days before the mutually agreed upon Closing Date.  Until then, the parties were working cooperatively and expeditiously toward the November 30, 2022 Closing, and Plaintiffs had no reason to believe the Closing would not occur on that date.  On

November 25, 2022, Credit Suisse and Purchaser formally informed Plaintiffs that Credit Suisse was experiencing an unspecified regulatory issue and that Purchaser would not consummate the Closing on November 30, 2022.

58.     On November 28, 2022, the parties participated in calls with Fannie Mae and Ginnie Mae.  During those calls, despite the fact that Plaintiffs intended to consummate the Closing on November 30, 2022, Purchaser informed the applicable representatives of Fannie Mae and Ginnie Mae that the Closing of the APA was not feasible at that time due to a confidential regulatory matter involving Credit Suisse.

59.     On November 29, 2022, Purchaser stated the same to Freddie Mac and confirmed its position by e-mail to Fannie Mae and Ginnie Mae.  Purchaser's statements to Fannie Mae and Ginnie Mae caused those Governmental Authorities to withhold or delay the issuance of their respective Required Approvals.

60.     Correspondence from Ginnie Mae stated that as of November 29, 2022, "the desk top review of SPS as subservicer" required by Schedule 3.04 "was completed and was in process for internal signoff."  Once Ginnie Mae received Purchaser's communication regarding a delay to Closing, however, Ginnie Mae delayed issuance of its Required Approval and stated that "approval will come later once the closing date on the transaction with Rushmore is confirmed." Fannie Mae similarly delayed issuance of its Required Approval in response to Purchaser's representation that Closing could not occur.

61.     Representatives of Sellers also received e-mail correspondence from a representative of Purchaser on November 28, 2022 and from a representative of Credit Suisse on November 29, 2022, each indicating that Purchaser would not consummate the Closing on the

mutually agreed Closing Date of November 30, 2022 because Closing was "not feasible" at the time "due to confidential regulatory matters."

62.     This correspondence falsely stated that the parties had reached an agreement that the new target Closing Date would be April 30, 2023.   The parties had reached no such agreement.

63.     On November 29, 2022, Plaintiffs wrote to Purchaser, stating that all of the closing conditions set forth in Article VIII of the APA were satisfied or waived (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), and Plaintiffs expected Purchaser to consummate the Closing the next day.

64.     On November 30, 2022—the mutually agreed upon Closing Date—Purchaser refused to consummate the Closing.   On that date, Purchaser wrote to Plaintiffs, confirming Purchaser's unwillingness to consummate the Closing that day.   Purchaser told Plaintiffs that a new target Closing Date would need to be established.   Purchaser insisted that a new date was required to accommodate "Purchaser's need to have resolved the confidential regulatory matters" that Purchaser had asserted made Closing not feasible.   At that time, Purchaser provided no further detail on these "regulatory matters."

65.     Purchaser also claimed that it was not obligated to consummate the Closing because the Closing conditions set forth in Article VIII had not been satisfied.   Incredibly, Purchaser claimed that "the full set of Required Approvals set forth in Schedule 3.04 of the Purchase Agreement have not yet been obtained," despite the fact that such Required Approvals were only withheld or delayed *as a result of statements made by Purchaser to the relevant Governmental Authorities*.

66.    Plaintiffs wrote to Purchaser on December 2, 2022, explaining that Purchaser's refusal to consummate the Closing was a breach of the APA, but that Plaintiffs remained ready and willing to consummate the Closing.  At this point, Plaintiffs were still in the dark about the alleged regulatory matters purportedly affecting the Closing.  Plaintiffs proposed a meeting between the parties' principals as soon as practicable to discuss and resolve the matter.

67.    Having received no substantive response to their December 2, 2022 letter, Plaintiffs again wrote to Purchaser via e-mail on December 7, 2022.  Receiving no substantive response still, Plaintiffs wrote to Purchaser on December 9, 2022.

68.    Meanwhile, what had previously been a smooth and efficient negotiation between the parties regarding the documents necessary to consummate the Closing ground to a near halt. Prior to Purchaser's assertion that the Closing was not feasible, the parties' transactional teams had been working together to negotiate and finalize the documents required by the APA to be exchanged and/or executed prior to or at the Closing.

69.    Since announcing it would not consummate the Transaction, Purchaser frustrated the negotiation and execution of certain documents necessary to consummate the Closing by the intended date.  For example, Purchaser failed to provide productive written revisions to the Transition Services Agreement for more than three weeks despite having had the latest draft from Plaintiffs since November 28, 2022.

70.    Despite Purchaser's refusal to engage, Plaintiffs stood ready and willing to finalize all required documents on or before November 30, 2022.  Sellers' obligations under the APA were satisfied.

**Purchaser Reveals Concealed Purported Requirement Of** ███████████████████████ ██.
**And Traps Plaintiffs In Limbo For Months**

71.     After counsel for Purchaser and Credit Suisse reached out on December 14, 2022, Plaintiffs' counsel conferred with counsel for Purchaser and Credit Suisse several times.  After several calls during which no new or material information was shared, on December 27, 2022, counsel for Purchaser and Credit Suisse finally revealed that ███████████████████████ ████████████████████████████████████████████████████ This was the regulatory matter previously invoked by Purchaser more than a month earlier.

72.     Unbeknownst to Plaintiffs, given Credit Suisse's business operations and status, Purchaser and its parent had taken the position that the Transaction was contingent upon ████ ███████████████████████ Purchaser knowingly and intentionally did not disclose this purported ████████████ prior to the execution of the APA or at any point until December 27, 2022.

73.     Purchaser's position that it could not proceed without ███████████████████ ████████ is in direct conflict with Purchaser's representations that the execution of the Transaction would not require any approvals or consents other than those included in Schedule 4.04 or those that would not materially delay or prevent the consummation of the Transaction (APA § 4.04); that there were no circumstances related to Purchaser's financial condition, ownership, or legal status that would reasonably be expected to impair the ability of the parties to consummate the Transaction (*id.* § 4.09); that the performance of the APA would not conflict with or violate any law or governmental order (*id.* § 4.03); and that Purchaser had all necessary authority to execute the APA and consummate the Transaction (*id.* § 4.02).

74.     While Purchaser caused the Transaction to remain in limbo, Plaintiffs were bound by a no-shop provision, which prevented them from attempting to identify other potential buyers

after the APA was executed but before the APA is consummated or terminated.  *See* APA § 5.06.

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████     █████████

███████████████████████████████████

**Purchaser Use An Invalid Pretext  To Terminate Without Paying A Termination Fee**

75.     After two months of stringing Plaintiffs along, Purchasers purported to terminate the APA on January 27, 2023.  Their notice, made through counsel, reads as follows in its entirety:

> Pursuant to Section 11.01 of the September 13, 2022 Asset Purchase Agreement ("APA"), we write on behalf of our client, Select Portfolio Servicing Inc., to provide notice of termination of the APA under Section 9.01(g).  We were informed that, despite our client's and Credit Suisse's best efforts, ████████████ ███████████████████████████

76.     This purported termination did not meet the requirements of Section 9.01(g) of the APA and was invalid.  As mentioned above, the APA contains a provision permitting any party to terminate if there is a final and non-appealable Governmental Order or action meeting the conditions of Section 9.01(g).  Despite Plaintiffs' requests for ████████████ █████████████████████████████████████████ Purchaser has offered no support except its own *ipse dixit* that ███████████████████████ ████████████████████.  Even if such an order or action did exist, Purchaser does not purport that ██████████████████ is non-appealable, as required to meet the conditions of Section 9.01(g).  To date, Purchaser has provided Plaintiffs with no documentation of ██████████████ or any effort on Purchaser's part to appeal ███████████████

(which Purchaser would be obligated to do); instead, Purchaser expects Plaintiffs to take Purchaser for its word, which has already proven unreliable.

77.    Even assuming Purchaser's characterizations of ███████████████████ to be true, Purchaser cannot invoke Section 9.01(g) to terminate.  Section 9.01(g) states that the termination right contained therein "shall not be available to any Party whose failure to comply with Section 8.04 has caused, resulted in or contributed to, such action or inaction."  In turn, Section 8.04 provides that no party can rely on the failure of any Closing condition if that party frustrated the satisfaction of those conditions.  Purchaser's conduct indicates that it contributed to and/or caused the Governmental Order or action, meaning Purchaser cannot invoke such an Order or action to terminate pursuant to Section 9.01(g).

78.    For instance, Purchaser had the obligation to "use commercially reasonable efforts" to do "all things necessary or desirable under Applicable Law to consummate, in the most expeditious manner practicable, the transactions contemplated by this Agreement" (APA § 5.04(a)) and "to obtain all Permits and make all notice and other filings with all Governmental Authorities and Investors that are or become necessary for its execution and delivery of, and the performance of its obligations pursuant to, this Agreement and the Transaction Agreements" (APA § 5.04(c)).  Based on information shared with Plaintiffs to date, it does not appear Purchaser used such commercially reasonable efforts ███████████████████████ ████████████████████████████.

**Plaintiffs Terminate And Are Entitled To The Termination Fee And Damages**

79.    For these reasons, Plaintiffs informed Purchaser that its termination was invalid on January 31, 2023.  In that same letter, because Plaintiffs now understood that Purchaser believed the regulatory impediment █████████████ was incurable, Plaintiffs terminated

the APA under Sections 9.01(c) (for breaches of representations and warranty) and 9.01(e) (failure to consummate the Closing).  As the APA makes clear, Plaintiffs are entitled to the Termination Fee because they have terminated under these sections.

80.    Plaintiffs have suffered and continue to suffer damages as a result of Purchaser's obfuscation.  As explained above, the APA provides the terms under which Purchaser will buy assets pertaining to the businesses from Sellers. ███████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████   ███████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████

81.    ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████   ████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████   ████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

82.    ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

83.    ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████



86.     As a result of the injury caused by Purchaser's actions, Plaintiffs are entitled to the Termination Fee, additional monetary damages, and an order from the Court that Plaintiffs' termination of the APA was valid while Purchaser's was not.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract)**

87.     Plaintiffs incorporate by reference as if fully set forth herein all facts and allegations set forth above.

88.     The APA is a valid and enforceable contract.

89.     Plaintiffs have performed all of their duties and obligations under the APA, except to the extent excused by the conduct of Purchaser.

90.     Purchaser has breached its representations and warranties, refused to fulfill its obligations, and has unilaterally breached the APA in numerous ways.  Specifically:

91.     Purchaser represented in Section 4.04 that "[t]he execution, delivery and performance by Purchaser of this Agreement and the Transaction Agreements and the consummation by Purchaser of the transactions . . . does not and will not require any consent, approval, authorization or permit of, action or waiver by, filing with or delivery of notice to, any Governmental Authority, except for (a) the approvals set forth in set forth in Schedule 4.04" and any notifications or approvals that, if they failed to be made or obtained, would not "prevent or materially delay" the consummation of the Transaction.  This representation was and is false, as Purchaser now takes the position that ███████████████████████ was and is required for the Transaction to be consummated.  Purchaser did not disclose ██████████ ███████████ in Schedule 4.04.  As is now obvious, Purchaser believes that ████████ ████████ to prevent or materially delay the consummation of the Transaction. Purchaser's representation in Section 4.04 of the APA was thus false, and Purchaser has breached this representation.

92.     As explained above, because Schedule 4.04 was not finalized by November 1, 2022, Section 4.04 is a Fundamental Representation.  Because Purchaser's representations in Section 4.04 were not and are not accurate, Sellers were not obligated to consummate the Closing and were permitted to terminate the APA.

93.     Purchaser represented in Section 4.09 that "[t]here is no fact, event or circumstance relating to Purchaser's business, operations, financial condition, ownership or legal status that, to the Purchaser's Knowledge, would reasonably be expected to impair in any material respect the ability of the Parties hereto to obtain all consents, orders, authorizations, and

approvals from any Investor or Governmental Authority necessary for the consummation of the transactions contemplated by this Agreement within the time period contemplated by this Agreement."  This representation was and is false, as ███████████ is a Governmental Authority as defined by the APA.  Purchaser knew or was reckless in not knowing that, due to Credit Suisse's legal status and ownership of Purchaser, Credit Suisse and Purchaser would be reasonably expected to take the position that ███████████████████████████

███████████ the Transaction, delaying or preventing the consummation of the Closing. Purchaser's representation in Section 4.09 of the APA was thus false, and Purchaser has breached this representation.

94.   Purchaser represented in Section 4.03 that "[t]he execution, delivery and performance of this Agreement and the Transaction Agreements by Purchaser . . . do not and will not materially conflict with or materially violate . . . any Law or Governmental Order applicable to Purchaser or by which any of Purchaser's properties or assets is bound."  This representation was and is false, as Purchaser's now maintains that its performance of the APA and consummation of the Transaction would ███████████████████████

███████████████████████████  Purchaser's representation in Section 4.03 of the APA was thus false, and Purchaser has breached this representation.

95.   Purchaser represented in Section 4.02 that it had "the requisite corporate power and authority" to consummate the Transaction and that "[t]he execution, delivery and performance by Purchaser of this Agreement and the Transaction Agreements and the consummation by Purchaser of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary action on the part of Purchaser."  APA § 4.02.   This

24

representation was and is false, as Purchaser █████████████████████████████████

███████████████████████████████ for the Transaction.

96.    Section 5.09 requires purchaser to "promptly notify the other Party of any written notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement." Purchaser did not, until December 27, 2022 (nearly a month after the agreed-upon Closing Date), notify Plaintiffs that ███████████████████████████████████████████████████████

█████████████████████████████ This failure to promptly notify Plaintiffs that ██

██████████████████████████████████████████████ was a breach of Section 5.09.

97.    Section 5.04(d) requires Purchaser to permit Plaintiffs to review in advance any correspondence with any Governmental Authority about the APA, notify Plaintiffs about any material communication with any Governmental Authority about the APA, and provide Plaintiffs with copies of correspondence with any Governmental Authority.   Purchaser did not notify Plaintiffs about ███████████████████████ regarding the APA until December 27, 2022—nearly a month after the intended Closing Date—did not permit Plaintiffs to review in advance ███████████████████████████████████████████████████

████████████████ to Plaintiffs.   These are breaches of Section 5.04(d).   If permission from ██

██████████████████████████ Purchaser's obligations under Section 5.04(d), Purchaser

████████████████████████████, or it should not have agreed to such terms in the APA that Purchaser knew it could not comply with.

98.    Section 5.04(a) requires the parties to use "commercially reasonable efforts" or to "cooperate with" Plaintiffs "to consummate, in the most expeditious manner practicable, the

transactions contemplated by [the APA]." Purchaser has frustrated the negotiation and execution of certain documents necessary to consummate the Closing. In regards to certain documents necessary for the Closing, Purchaser failed to meaningfully respond to Plaintiffs for several weeks. Purchaser deliberately dragged its feet in contravention of its duties under Section 5.04(a). On information and belief, Purchaser also failed to use commercially reasonable efforts to ███████████████████████████████████████████████████ in an expeditious manner. These are breaches of Section 5.04 of the APA.

99.     Section 5.04(b) of the APA requires Purchaser to use commercially reasonable efforts and to cooperate with Plaintiffs to "obtain as promptly as practicable all Required Approvals . . . ." By informing representatives of the applicable Governmental Authorities on November 28 and 29 that the Closing of the APA was "not feasible," Purchaser did precisely the opposite of what was required under Section 5.04(b). This was an independent breach of the APA.

100.    Section 5.04(c) of the APA requires Purchaser to use commercially reasonable efforts "to obtain all Permits and make all notice and other filings with all Governmental Authorities and Investors that are or become necessary for its execution and delivery of, and the performance of its obligations pursuant to, this Agreement and the Transaction Agreements." On information and belief, Purchaser has also failed to use commercially reasonable efforts to work with ██████████████████████████████████ in an expeditious manner, in breach of Section 5.04(c).

101.    Further, the non-occurrence of Required Approvals from Fannie Mae and Ginnie Mae did not eliminate Purchaser's duty to Close. Purchaser materially contributed to this non-occurrence because Purchaser directly caused Fannie Mae and Ginnie Mae to withhold or delay

their approvals for the Transaction.  Under New York law, as well as the terms of the APA, Purchaser cannot cause the Required Approvals to be withheld or delayed and then use the lack of Required Approvals as an excuse to avoid its obligations to consummate the Closing.  *See* APA § 8.04.

102.    Each of these breaches is a separate and independent breach of the APA.

***Termination Fee***

103.    Plaintiffs are entitled to the Termination Fee set forth in Section 9.03(a).

104.    Plaintiffs terminated the APA on January 31, 2023 pursuant to Section 9.01(c) and Section 9.01(e).  Plaintiffs' termination was the only effective termination of the APA.

105.    Section 9.01(c) provides that the APA may be terminated:

> by written notice from Sellers ***if Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would result in the failure of any condition of Sellers' obligation to consummate the transactions contemplated hereby*** and (ii) either (A) has not been cured on the earlier of (x) within thirty (30) days following the delivery of written notice of such breach or failure by Sellers and (y) the Termination Date, or (B) is not capable of being cured by the Termination Date; provided that Sellers may not then be in material breach of this Agreement so as to cause the breach or failure of any condition of the Purchaser's obligation to consummate the transactions contemplated hereby . . . .

APA § 9.01(c) (emphasis added).

106.    Sellers have performed all of their duties and obligations under the APA, except to the extent excused by the conduct of Purchaser.

107.    Plaintiffs were entitled to terminate the APA under Section 9.01(c) given Purchaser's breach of its representations in Section 4.04 described above.  Because Schedule 4.04 was never finalized, Section 4.04 is a Fundamental Representation, and Sellers' obligation to close is dependent on the accuracy of the representations in Section 4.04.  Because

Purchaser's representations in Section 4.04 were and are false, Sellers were entitled to terminate. Purchaser signaled in its own purported letter of termination that it believes ███████████ ████████████████████████████████████████████ Plaintiffs are thus justified in terminating the APA pursuant to Section 9.01(c) because such breach was either never capable of being cured or is now "not capable of being cured."[4]

108.   Plaintiffs were also entitled to terminate the APA under Section 9.01(c) given Purchaser's breach of its representations in Section 4.02 described above.  Section 4.02 is a Fundamental Representation of Purchaser under the APA.  Because Purchaser's representations in Section 4.02 were and are false, Sellers were entitled to terminate.  Purchaser signaled in its own purported letter of termination that it believes ███████████████████ ██████████████████████████ Plaintiffs are thus justified in terminating the APA pursuant to Section 9.01(c) because such breach was either never capable of being cured or is now "not capable of being cured."

109.   Plaintiffs were also entitled to terminate the APA under Section 9.01(c) given Purchaser's breach of its covenants in Article V described above.  Section 8.03(a) conditions Sellers' obligations to close on Purchaser having "performed, in all material respects, the obligations hereunder required to be performed by it on or prior to the Closing Date."  Purchaser signaled in its own purported letter of termination that it believes ████████████ ███████████████████████████ Plaintiffs are thus justified in terminating the APA pursuant to Section 9.01(c) because such breach was either never capable of being cured or is now "not capable of being cured."

---

[4]   In any event, Plaintiffs notified Purchaser of these breaches no later than January 10, 2023, meaning Purchaser's 30-day cure period will expire on February 10, 2023.

110.    Plaintiffs were also entitled to terminate under Section 9.01(c) because all of Plaintiffs' breaches described above have caused the failure of the conditions in Section 8.01(b) to be met. Sellers' obligation to consummate the Closing is conditioned on the absence of any "Law or Governmental Order directly or indirectly restraining or prohibiting the transactions contemplated in this Agreement or any of the Transaction Agreements." APA § 8.01(b). Purchaser has taken the position that ████████████████████████████████ is restraining or prohibiting the Closing, meaning the conditions in Section 8.01(b) are not satisfied. Purchaser signaled in its own purported letter of termination that it believes ████████ ████████████████████████████████████████ Plaintiffs are thus justified in terminating the APA pursuant to Section 9.01(c) because such breach was either never capable of being cured or is now "not capable of being cured."

111.    Separately, Section 9.01(e) provides that the APA may be terminated:

> by Sellers if (i) all of the conditions set forth in Section 8.01 and Section 8.02 have been and continue to be satisfied or shall be capable of being satisfied at the Closing Date were the Closing to occur at such time and (ii) Purchaser fails to consummate this Agreement and the Transaction Agreements within two (2) Business Days of the date that the Closing should otherwise have occurred pursuant to Section 2.03(a) hereof and (iii) Sellers stood ready and willing to consummate the Closing on the date the Closing should otherwise have occurred pursuant to Section 2.03(a);

APA § 9.01(e).

112.    As of the Closing Date, November 30, 2022, all of the conditions set forth in Section 8.01 and Section 8.02 were either satisfied by the Parties, were capable of being satisfied, or had been frustrated by Purchaser. Though Fannie Mae and Ginnie Mae withheld their approvals on that date, Purchaser cannot rely on the failure of those conditions because it was Purchaser's own actions that caused their failure. *See* APA §§ 8.02(f), 8.04. ████████

████████████████████ was not a condition to Closing, nor was it even mentioned anywhere in the APA, because it had never been disclosed by Purchaser. Purchaser did not Close within two Business Days of the Closing Date, permitting Plaintiffs to terminate pursuant to Section 9.01(e).

113. Section 9.03(a) provides that if the APA is terminated by Sellers pursuant to Section 9.01(c) or Section 9.01(e), then Purchaser will pay to Roosevelt Parent an amount equal to ████████████████ (the "Termination Fee"). ████████████████████████

████████████████████████████████████████████████

███████████████ *See* APA § 1.01.

114. Plaintiffs have also suffered substantial damages as a direct and proximate result of Purchaser's breaches of the APA in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

115. Plaintiffs incorporate by reference as if fully set forth herein all facts and allegations set forth above.

116. Implied in all contracts governed by New York law is a covenant of good faith and fair dealing. The implied covenant of good faith and fair dealing provides that a party shall not do anything that will have the effect of interfering with or damaging the right of another party to receive the benefits of the contract.

117. The implied covenant of good faith and fair dealing in the APA requires, to the extent that the APA does not expressly require it, that Purchaser exercise any discretion afforded under the APA in good faith and in such a way as to not frustrate the purposes of the APA and to work toward Closing with Plaintiffs in good faith.

118.    Purchaser breached the implied duty of good faith and fair dealing by claiming it could not consummate the Closing due to a regulatory issue but refusing for a month after the Closing Date to provide any information regarding what the regulatory issue was so that Plaintiffs could evaluate their situation and options.

119.    Purchaser further breached the implied duty of good faith and fair dealing by claiming it could not consummate the Closing due to a regulatory issue but refusing for months to release Plaintiffs from the no-shop provision to identify other potential buyers that would be able to consummate the transaction.

120.    On information and belief, Purchaser has also failed to use commercially reasonable efforts to ███████████████████████████ in an expeditious manner, which is an independent breach of the covenant of good faith and fair dealing.

121.    Purchaser acted in bad faith and in an unreasonable manner, with the intent of preventing Plaintiffs from receiving the fruits of their bargain under the APA while keeping them constrained from finding other potential buyers.   Purchaser's actions were knowing and intentional and designed to frustrate Plaintiffs' rights and the Transaction.

122.    Plaintiffs have suffered substantial damages as a direct and proximate result of Purchaser's conduct in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
### (Fraud)

123.    Plaintiffs incorporate by reference as if fully set forth herein all facts and allegations set forth above.

124.    To induce Plaintiffs to enter into the APA, Purchaser made material and intentional misrepresentations of present fact to Plaintiffs.   These misrepresentations of present

fact are separate from any promise to perform under the APA. Purchaser misrepresented, among other things:

- Purchaser's performance under the APA would not require any consent, approval, authorization, or notice to any Governmental Authority except those explicitly disclosed or that could not materially delay or prevent the consummation of the Closing. *See* APA § 4.04.

- There were no regulatory impediments to Purchaser's consummation of the Transaction. *See id.* § 4.09.

- Purchaser had the requisite power and authority to execute the APA and consummate the Transaction. *See id.* § 4.02.

- Purchaser's performance under the APA would not materially conflict with or violate any Law or Governmental Order. *See id.* § 4.03.

125.    Purchaser knew that the representations alleged above were material, false, and misleading.

126.    Purchaser made these misrepresentations with the intent and expectation that Plaintiffs would rely on them in deciding to enter into the APA.

127.    Plaintiffs' reasonably relied on Purchaser's misrepresentations, and the information misrepresented and concealed by Purchaser was solely within Purchaser's possession.

128.    Purchaser also failed to disclose and intentionally concealed material present facts that were unknown to Plaintiffs in order to induce Plaintiffs to enter into the APA.

129.    Purchaser failed to disclose and concealed its position that ███████████ ███████████ would be necessary to consummate the Transaction.

130.    Purchaser had a duty to disclose this material information. Purchaser knew that this information was material, that Plaintiffs did not have access to this information, and that Purchaser's failure to disclose and its concealment of the information would mislead Plaintiffs in connection with their agreement to the APA. These material facts were solely within

Purchaser's possession, and Plaintiffs were unable to uncover these facts despite substantial due diligence.

131.    Purchaser failed to disclose and concealed the material information described above with the intent to deceive Plaintiffs into entering the APA.

132.    Plaintiffs reasonably relied on the accuracy and completeness of Purchaser's representations.

133.    But for Purchaser's misrepresentations and omissions, Plaintiffs would not have entered into the APA as written.  Plaintiffs would not have agreed to enter into the APA and subject themselves to a no-shop provision knowing that Credit Suisse and Purchaser would take the position that ███████████████████████████████ the Transaction before it could be consummated.

134.    ██████████████████████████████, in reliance on Purchaser's representations that only the approvals or consents disclosed (or not reasonably expected to affect the parties' ability to consummate the Transaction) would be required.

135.    Plaintiffs have suffered substantial damages as a direct result of Purchaser's fraudulent misrepresentations, failures to disclose, and concealments of material facts in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF
#### (Declaratory Judgement)

136.    Plaintiffs incorporate by reference as if fully set forth herein all facts and allegations set forth above.

137.    There is a present and justiciable dispute regarding the parties rights and obligations under the APA.

138.     This action presents a controversy involving the rights and relations parties to the APA.

139.     The interests of Plaintiffs, on the one hand, and Purchaser, on the other, are real and adverse.

140.     The dispute between the parties is ripe for judicial disposition given that Plaintiffs and Purchaser disagree regarding whether Purchaser breached the APA and whether Purchaser's purported January 27, 2023 termination was valid.

141.     Based on the foregoing, absent court intervention, Purchaser will operate as if it terminated the APA on January 27, 2023 even though it had no right to do so.  Purchaser will further wrongfully disregard Plaintiffs' effective termination of January 31, 2023.

142.     Accordingly, Plaintiffs seek a declaratory judgment that: (i) Purchaser's January 27, 2023 notice of termination was invalid and has no effect; and (ii) the APA was terminated by Plaintiffs on January 31, 2023 pursuant to Sections 9.01(c) and 9.01(e), entitling Plaintiffs to the Termination Fee pursuant to Section 9.03(a).

**<u>Prayer for Relief</u>**

WHEREFORE, Plaintiffs respectfully request:

(a)     A judicial declaration that:  (i) Purchaser's January 27, 2023 notice of termination was invalid and has no effect; and (ii) the APA was terminated by Plaintiffs on January 31, 2023 pursuant to Sections 9.01(c) and 9.01(e), entitling Plaintiffs to the Termination Fee pursuant to Section 9.03(a).

(b)     An award in favor of the Plaintiffs and against Purchaser on all claims asserted in this complaint;

(c)     A payment of the Termination Fee from Purchaser;

(d)     Damages in an amount to be determined at trial;

(e)     Reasonable costs and attorneys' fees incurred in this action;

(f)     Pre-judgment interest on all damages; and

(g)     Such other relief as the Court deems just and proper.


Dated: New York, New York
       February 6, 2023

                              QUINN EMANUEL URQUHART &
                              SULLIVAN, LLP


                         By:  _____
                              R. Brian Timmons (*pro hac vice* forthcoming)
                              Renita Sharma
                              Leigha Empson
                              51 Madison Avenue, 22nd Floor
                              New York, NY 10010
                              Telephone: (212) 849-7000
                              Facsimile: (212) 849-7100
                              briantimmons@quinnemanuel.com
                              renitasharma@quinnemanuel.com
                              leighaempson@quinnemanuel.com


                              *Attorneys for Plaintiffs*